UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ) | | |
| ) | | |
| Plaintiff, ) | Case No. 2:12-cr-00429-JCM-GWF | |
| ) | | |
| vs. ) | **FINDINGS & RECOMMENDATIONS** | |
| ) | | |
| CRAIG CURTIS SILL, ) | **Motion to Suppress (#51)** | |
| ) | | |
| Defendant. ) | | |

This matter is before the Court on Defendant Craig Curtis Sill's Motion to Suppress Evidence for Fourth Amendment Violation (#51), filed on May 20, 2013. The Government filed its Response in Opposition to Defendant's Motion to Suppress (#60) on June 6, 2013. The Court conducted an evidentiary hearing on June 27, 2013.

Defendant Craig Curtis Sill is charged in a three count indictment with conspiracy to manufacture a controlled substance, manufacture of a controlled substance, and possession of a controlled substance in violation of 21 U.S.C. §846, §841(a)(1) and (b)(1)(C), and 18 U.S.C. §2. *Indictment (#1).* The indictment arises from evidence seized during the execution of a search warrant at Defendant's house on September 6, 2012. Defendant moves to suppress the seized evidence on the grounds that the search warrant application was based on information obtained during prior warrantless entries into his house that violated the Fourth Amendment. The Government contends that the prior entries were justified under the exigent circumstances exception to the Fourth Amendment's warrant requirement.

. . .

. . .

**FACTUAL BACKGROUND**

**1.      Contents of the Search Warrant Declaration.**

On September 6, 2011, Detective Randy Dockery of the Las Vegas Metropolitan Police Department (LVMPD) applied to a Clark County, Nevada justice-of-the-peace for a telephonic search warrant to search Defendant Sill's house for evidence relating to the manufacture and possession of Dimethyltryptamine (DMT). *Motion to Suppress (#51), Exhibit A, Search Warrant Declaration (hereinafter "Declaration")*. In support of the issuance of the search warrant, Detective Dockery's declaration stated as follows:

On September 6, 2011, LVMPD Officer Allan Dong went to 239 E. Maulding Avenue, Las Vegas, Nevada to investigate a report by a neighbor that an ex-tenant of 239 E. Maulding had just broken into the house. The neighbor stated the ex-tenant attempted to open the front door with a key, but when that didn't work, went around to the side of the residence. Detective Dockery's declaration, stated "[t]he subject left prior to Officer Dong's arrival." *Id., pg. 33*. When Officer Dong arrived, he observed that a window was broken out and a door was open. The officers then cleared the house for suspects. The declaration further stated:

> Officer Dong went into the room in the southwest corner of the residence off of the kitchen. Officer Dong observed jars of suspicious brown liquid, lye and other items he believed to be associated with controlled substances. Officer Dong requested Narcotics Detectives to respond. Prior to your Affiant's arrival the subject seen by the neighbor came back to the house and met with Officer Dong.

*Declaration, pg. 33*.

Detective Dockery stated that upon his arrival at the residence, he spoke with the subject, Marshall Gunnell, who told him he had been house sitting for the owner, Craig Curtis Sill, who had left the residence on August 24, 2011 to go to the "Burning Man" festival in Northern Nevada. Mr. Gunnell said that he stayed in his camper in front of the house, but went inside the house on occasion. On September 2, 2011, Mr. Gunnell observed a Constable sticker on the front door of the house. He then left and returned on September 6th. Mr. Gunnell observed that the lockout sticker was gone, the back door was open and stereo speakers were outside in the backyard. Mr. Gunnell called Mr. Sill who asked him to go back to the house and keep watch over the residence.

2

Detective Dockery's declaration then stated:

> Your Affiant went into the residence with Officer Dong to look at the suspicious items. There were several bags of mimosa roots, bottles of lye, cans of Naptha fuel, and several jars of brown liquid. Your Affiant determined that the suspects were manufacturing DMT, Dimethyltryptamine. A recipe for the extraction process was on top of the jars of suspicious brown liquid. . . .

*Declaration, pg. 34.*

The declaration goes on to describe the manner in which DMT is used, its effect on the mind and its classification as a Schedule I Controlled Substance. It also set forth the manufacturing process of DMT. *Id. pg. 34.* Based on Detective Dockery's declaration, the justice-of-the-peace issued the search warrant. The police then executed the warrant and seized paperwork and numerous items allegedly used in the manufacture of DMT.

### 2. **Officer Dong's Testimony.**

Officer Allan Dong testified at the evidentiary hearing. Officer Dong has been employed as a patrol officer with the LVMPD for 18 1/2 years. During his career he has been assigned to the vice and criminal intelligence units. Officer Dong has received training in narcotics offenses and commonly encounters illegal drugs as a police officer. He also received basic training about illegal drug laboratories in the police academy. Officer Dong was taught to look for elements of drug labs such as "pyrex" (glass cooking equipment), pseudoephedrine, lye and similar things. He was taught to observe different types of narcotics manufacturing. He was also taught that drug labs have a "volatile nature," i.e. they may blow-up, and he received general training regarding the dangers of various chemicals used in illegal drug labs. Officer Dong estimated that he has encountered 30-40 drug labs during his 18 years with the LVMPD. These were either methamphetamine labs or marijuana grow operations. In connection with methamphetamine labs, he has observed the presence of lye, respirators, pyrex, and waste material. He testified that when he encounters a suspected illegal narcotics laboratory, he will contact the Narcotics Bureau to respond because patrol officers do not have the equipment or training to deal with such labs "on a daily basis."

. . .

1    Officer Dong testified that he went to 239 E. Maulding Avenue on September 6, 2011 in
2 response to a call from a neighbor who observed a man trying to get into the house that had been
3 sealed by the Constable's Office--an orange sticker had been placed on the front door. The
4 neighbor reported that the man tried the front door with a key, couldn't get in and then went around
5 to the back. Officer Dong arrived at the house approximately 10-20 minutes after the neighbor
6 called the police. He testified there had been a couple of prior calls for police service at 239 E.
7 Maulding Avenue during the week leading up to September 6th. He believed the house had been
8 "cleared" on those prior occasions, but he did not know if police officers had actually entered the
9 house.

10    Officer Dong was accompanied to the house by his partner, Officer Rossi. He believes a
11 third officer may have also responded. He described the house as a two story older custom house
12 on a half-acre lot, with a large pool in the back. The house was located in a residential
13 neighborhood, but there are also commercial buildings in the area. Upon arriving at the house,
14 Officer Dong observed the broken Constable's seal on the front door. The front door was locked.
15 He testified that a Constable's seal is placed on a building when there has been an order of eviction.
16 Officer Dong walked around to the eastside of the house where he observed a broken window. He
17 then went down to the basement area, where he found an open door. He testified the door was
18 "cracked" open. Officer Dong entered the house through the open door to determine if an intruder
19 was inside. No one was found in the house.

20    Officer Dong testified that there was graffiti or artwork painted on the walls inside the
21 house. There was very little furniture in the rooms and pillows were scattered around. There was
22 a plexiglass floor on a second floor landing area. It appeared to Officer Dong that only part of the
23 house was being used for living purposes. It appeared to be a "party house." There was a painted
24 sign on the wall that gave instructions or stated the cost of admission. *See Government's Exhibit 1,*
25 *photograph.*

26    While searching the house for a possible intruder, Officer Dong entered a small bedroom
27 located off the kitchen. In this bedroom, he observed glass mason jars containing a dark liquid, a
28 respirator, coffee filters, a container of lye, drain cleaner and tree branches. He also observed a

single piece of paper, with an equation written on it, sitting on top of the mason jars. Officer Dong testified that the equation concerned him because it indicated some form of laboratory. The appearance of the liquid in the jars was not something Officer Dong had previously seen. He stated that coffee filters and respirators are commonly used in illegal drug manufacturing. Officer Dong also thought a toxic substance might be present because of the presence of the lye and the respirator. There were also plastic bags in the room that contained a red powdery substance. The bags were labeled "mimosa hostilis." (It was not clear from the testimony whether Officer Dong observed the wording on the labels during his initial entry or when he returned to the room with Detective Dockery.) Officer Dong did not know the meaning of "mimosa hostilis."

Officer Dong testified that he called a Narcotics Bureau sergeant while he was still inside the house. He told the sergeant that he really didn't know what he had, but he suspected possible narcotics manufacture. The sergeant told him to stand by and he would send someone. Officer Dong testified that based on what he had observed in the bedroom, he believed there was probable cause for a search warrant. He did not have the expertise to deal with narcotics laboratories, however, and the Narcotics Bureau was better able to handle the situation and the potential dangers than he was.

Officer Dong testified that after he exited the house, he spoke to the neighbor who had called the police. Officer Dong testified that he was not informed before entering the house that the person who attempted to enter the house had left the property before the officers arrived. Officer Dong stated that he had observed a white car parked in the cul-de-sac when he arrived at the property. An RV (motor home) later arrived and parked in the driveway of the house. Officer Dong also spoke to the driver of the RV, Marshall Gunnell, after he exited the house. Mr. Gunnell stated that the owner of the house, Mr. Sill, was at the "Burning Man" festival. Officer Dong testified that he is aware that hallucinogenic drug use is associated with the Burning Man festival.

Detective Dockery arrived at 239 E. Maulding Avenue approximately 30 minutes after Officer Dong spoke to the Narcotics Bureau sergeant. Officer Dong told Detective Dockery about the written equation, lye, drain cleaner, and jars of liquid in the bedroom and that he suspected some type of drug manufacturing in the house. Officer Dong and Detective Dockery then entered

the house and proceeded directly to the bedroom where Officer Dong had observed the suspicious items. He stated that Detective Dockery did not enter any parts of the house other than those he had to walk through to get to the bedroom. Officer Dong estimated that he and Detective Dockery were inside the house for 10-15 minutes. They exited the house by the same route. He did not recall whether Detective Dockery spoke to Mr. Gunnell before they entered the house.

Officer Dong acknowledged on cross examination that there was no overwhelming odor coming out of the house. He did not observe any open flames or anything cooking inside the residence. Nor did he observe any glass cooking equipment, such as he has seen in connection with methamphetamine labs. Officer Dong did not see any containers of Naptha in the bedroom where the other items were found. He did not believe the building was going to blow up at any minute. Officer Dong testified on redirect examination, however, that some chemicals or chemical combinations are combustible or present a danger of explosion even if no heat source is present. He also thought it was possible that he had been exposed to toxic chemicals. He therefore believed the items constituted a potential danger to the police officers and neighbors in the vicinity of the house. Officer Dong acknowledged that he and Detective Dockery did not wear any protective gear or respirators when they re-entered the house.

### 3. Detective Dockery's Testimony.

Detective Randy Dockery testified that he has been employed by the LVMPD for sixteen years and has been a narcotics detective for the past eleven years. He has received specialized training in narcotics and narcotics offenses, including a week long Drug Enforcement Administration (DEA) course regarding clandestine drug laboratories during which the students manufactured illegal drugs. Detective Dockery learned of the dangers associated with drug labs, including fire and odorless phosphine gas which is a byproduct of methamphetamine production. Detective Dockery testified that he has investigated between 50 and 100 illegal drug labs. With the exception of this case, all of the illegal drug labs were methamphetamine labs. He was involved in the investigation of a methamphetamine lab that caused a fire in a condominium complex. In another investigation, he and other officers were required to enter a building "fully encapsulated" in protective gear and breathing equipment to deal with an active methamphetamine lab. Detective

Dockery testified that a flame or heat source is not always required for there to be a danger of explosion from chemicals used in drug labs.

Detective Dockery testified that if patrol officers encounter a suspicious substance they believe is drug related, they will call the Narcotics Bureau for assistance. All of the narcotics detectives are lab and "hazmat" (hazardous materials) certified. If the patrol officers do not believe the suspicious substance is drug related, they will call the ARMOR Detail which deals with suspected bombs and poisons such as ricin or anthrax. Detective Dockery testified that in responding to a request for assistance at the scene of a suspected drug lab, the narcotics detectives first assess the situation by asking the patrol officers what they have seen and smelled. The detectives also ask the officers if they are feeling any symptoms, such as lightheadedness or wooziness, which would indicate they have been exposed to toxic chemicals. The detectives' initial priority is safety. They seek to determine whether the suspected drug lab is active and whether evacuations of neighbors may be necessary.

Detective Dockery testified that items commonly found in methamphetamine labs include chemicals, and fuels such as Naptha or Coleman fuel, red phosphorous and iodine. Waste products from pseudoephedrine capsules are also commonly found. Other items associated with the production of methamphetamine include coffee filters, rags, tubing, and pyrex glass containers used in the cooking process.

Prior to the instant case, Detective Dockery had never investigated a case involving Dimethyltryptamine (DMT). Nor had he even heard of the drug. As a result of this investigation, he learned that DMT is a powerful hallucinogen drug made from the naturally occurring mimosa hostilis root. Dimethyltryptamine is extracted from the mimosa hostilis root bark through a chemical process. Detective Dockery generally described the process as involving the grinding of the mimosa hostilis root bark into a powdery substance. The powder is mixed with Naptha and lye and then frozen until it crystalizes. No fire or cooking is required to produce DMT.

Detective Dockery testified that on September 6, 2011 his sergeant directed him to go to 239 E. Maulding Avenue to meet with Officer Dong regarding a suspected drug lab. Detective Dockery was familiar with Officer Dong and knew that he had been employed as a LVMPD officer

for many years.  Upon arriving at  239 E. Maulding Avenue, Detective Dockery saw Officer Dong's patrol vehicle in front of the residence.  He described the neighborhood as an area of nice custom or semi-custom homes on large lots.  The subject house was a large home and was situated on a half-acre lot.  Officer Dong told Detective Dockery that he was not sure what he had.  Officer Dong described what he observed in the bedroom of the house.  He stated he observed a suspicious dark brown liquid in jars and a chemical equation written on a paper lying on top of the jars.  He also stated he saw a respirator and  "Red Devil" lye.  Officer Dong told him:  "I don't know what it is."  Officer Dong also stated: "It looks like they're making methamphetamine, but its suspicious, something's not right."  Based on what Officer Dong described, Detective Dockery thought it possible the liquid was methamphetamine which has a dark red color when mixed with red phosphorous.  Detective Dockery testified that respirators are typically present in methamphetamine labs.  He also testified that the LVMPD has not encountered as many methamphetamine labs in recent years as they formerly did.  Most of the methamphetamine labs are "box labs," meaning that the cooking process has been completed.

Detective Dockery testified that Officer Dong's information caused him concern that dangerous chemicals might be present in the house.  He believed it was necessary to inspect the items to see what "we are dealing with" and decide whether there was a high level of danger such that neighbors should be evacuated and Officer Dong should be medically examined.  Before entering the house, Detective Dockery also spoke with Marshall Gunnell who told him the house belonged to Mr. Sill.  Mr. Gunnell stated that he had come by the house a few days earlier at which time there was an eviction notice or Constable's sticker on the door.  He returned to the house on September 6th and noticed that the sticker was gone.  Mr. Gunnell stated that he had spoken to Mr. Sill who told him he was out of town and asked Mr. Gunnell to watch the house.  Mr. Gunnell told Detective Dockery he intended to stay at the property in his motor home and keep an eye on it for Mr. Sill.  Mr. Gunnell also said Mr. Sill was at the Burning Man festival in Northern Nevada. Detective Dockery testified that it is his understanding that widespread marijuana and hallucinogenic drug use occurs at the Burning Man festival.  Detective Dockery has not attended the Burning Man festival and it was not clear whether his understanding about drug use at the

1 Burning Man festival comes from law enforcement sources.

2 Detective Dockery testified that he and Officer Dong entered the house through the front
3 door. They walked to southwest corner of the house, through the kitchen, and into the rear
4 bedroom where the suspicious items were located. Detective Dockery saw a respirator and nine or
5 ten jars containing a "bi-layer" liquid that was dark brown in color. He also observed a cardboard
6 box on the floor which contained several sticks that looked like "firewood" kindling. There were
7 several plastic bags containing a reddish brown powder. Detective Dockery observed that the label
8 on these bags stated "mimosa hostilis." Detective Dockery was not familiar with this term. He
9 also observed the written "equation" which he later learned was the recipe for DMT. He also saw
10 the container of Red Devil lye.

11 Detective Dockery testified the bi-layer liquid was suspicious. The term bi-layer means
12 that different substances in the container have not mixed and thus are in different layers. Liquid
13 methamphetamine appears in such a bi-layer form. He also observed residue in empty cups which
14 indicated that they had been used in some type of process. He also saw coffee filters and syringes
15 which can be used as filtering or measuring devices in the production of illegal drugs. Based on
16 what he observed, Detective Dockery believed the items were part of a drug lab. Detective
17 Dockery did not recall seeing Naptha in the bedroom where the other items were located.
18 However, he saw cans of Naptha in the center room or main room of the house as he walked to and
19 from the bedroom.

20 Detective Dockery testified that he and Officer Dong were in the bedroom "maybe one
21 minute" and were inside the house a total of one minute and fifteen seconds. They exited the house
22 by the same route they entered. Detective Dockery testified that if Officer Dong estimated they
23 were in the room 10-15 minutes, he would be wrong. Detective Dockery testified he did not intend
24 to stay inside the house a long time or to touch any items. He went in to inspect the items that
25 Officer Dong had seen and to determine if there was a danger or hazard that needed to be dealt
26 with. He did not believe it necessary to wear a respirator or protective clothing before entering the
27 house.
28 . . .

After exiting the house, Detective Dockery used his I phone to "google," i.e. research, the term mimosa hostilis. He learned that it is the precursor or primary ingredient for DMT. Based on his observations, Detective Dockery determined the items in the house did not pose a danger to officers or others in the area. He testified there was "nothing bubbling, nothing cooking, no fire or any kind of heat source or electricity" that would pose a danger. There was also nothing to indicate that Officer Dong would have health problems from exposure to dangerous substances. Detective Dockery testified that he then called the rest of the narcotics team to come to the house.

Detective Dockery testified on cross-examination that prior to entering the house, he asked Officer Dong to tell him what he had observed. He did not ask Officer Dong specific questions such as whether there was an open flame. He may have asked follow-up questions about things Officer Dong said he observed. Detective Dockery did not specifically recall asking Officer Dong if anything was bubbling. He did not ask Officer Dong if he smelled anything suspicious. Detective Dockery stated the main fear in a methamphetamine lab is the presence of phosphine gas which is odorless. He acknowledged, however, that there may be odorous fumes associated with an active methamphetamine lab. Detective Dockery did not smell any odors coming from the house. Detective Dockery reiterated that Officer Dong told him "he thought it was some type of lab, but he wasn't sure" what it was.

## DISCUSSION

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." Warrantless entries into the home are presumptively unreasonable. *United States v. Perea-Rey*, 680 F.3d 117, 1186 (9th Cir. 2012), quoting *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

An exception to the warrant requirement exists, however, when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *United States v. Snipe*, 515 F.3d 947, 950

(9th Cir. 2008), quoting *Mincey v. Arizona*, 437 U.S. 385, 393-94, 98 S.Ct. 2408 (1978) (internal quotation marks omitted). "Exigent circumstances are defined to include those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Fisher v. City of San Jose*, 558 F.3d 1069, 1075 (9th Cir. 2009) (internal quotation marks omitted). *See also United States v. Snipe*, 515 F.3d at 950 ("The need to protect or preserve life or avoid serious injury is one such justification for what would be otherwise illegal absent exigency or emergency."). The government has the burden of proving that exigent circumstances rendered a warrantless search reasonable. *Huff v. City of Burbank*, 632 F.3d 539, 545 (9th Cir. 2011), citing *Welsh v. Wisconsin*, 466 U.S. 740, 749-50, 104 S.Ct. 2091 (1984). That burden is especially heavy when the exception must justify a warrantless entry of the home. *United States v. Martinez*, 643 F.3d 1292, 1296 (10th Cir. 2011).

In *Brigham City v. Stuart*, 547 U.S. 398, 126 S.Ct. 1943, 1948 (2006), the Supreme Court held that a police officer's subjective motivation is irrelevant to determining whether a warrantless entry is justified under the exigent circumstances exception. The court must decide, based the totality of the circumstances, whether the officer's action was objectively reasonable and whether the manner of the officer's entry was also reasonable. *See also United States v. Snipe*, 515 F.3d at 951. Under *Brigham City*, probable cause to search a place exists when law enforcement officers have an objectively reasonable basis for concluding that an emergency is unfolding in that place. *Snipe*, 515 F.3d at 952. In light of *Brigham City*, the Ninth Circuit adopted "a two pronged test that asks whether: (1) considering the totality of the circumstances, law enforcement had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the search's scope and manner were reasonable to meet the need. Under this test, if law enforcement, while responding to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would be found." *Snipe*, 515 F.3d at 952.

. . .

1. **Whether Officer Dong's Initial Entry Was Justified Under the Exigent Circumstances Exception.**

The first question is whether Officer Dong's initial entry into the house was justified under the exigent circumstances exception. In *United States v. Valles-Valencia*, 811 F.2d 1232, 1236 (9th Cir. 1987), the court upheld the officers' warrantless entry into a house to investigate a possible burglary. The court stated:

> The circumstances known to the officers supported probable cause to enter the building to learn what was happening. After the officers entered the upstairs and arrested Soto-Leal and Bustamante, they were justified in conducting a protective sweep of the remaining rooms. They reasonably believed that "there might be other persons on the premises who could pose some danger to them." *United States v. Gardner*, 627 F.2d 906, 909-10 (9th Cir. 1980).

Other federal circuits have also held that a warrantless entry into a house is justified when the police officers have probable cause to believe that a burglary is in progress. *United States v. Brown*, 449 F.3d 741, 748 (6th Cir. 2006); *United States v. McCullough*, 457 F.3d 1150, 1164 (10th Cir. 2006). In *Brown*, the Sixth Circuit stated as follows:

> This and other circuits have held that an officer may lawfully enter a residence without a warrant under the exigent circumstances exception when the officer reasonably believes a burglary is in progress. *United States v. Estese*, 479 F.2d 1273, 1274 (6th Cir. 1973) (holding warrantless search of residence was justified because there was probable cause to believe burglary was in progress); *see also* [*United States v. Johnson*, 9 F.3d 506, 509 (6th Cir. 1988)] (noting that several other circuits "have upheld warrantless searches conducted during burglary investigations under the rubric of exigent circumstances") (citing cases). When probable cause exists to believe a burglary is in progress, officers are presented with exigent circumstances justifying their warrantless entry into the residence "because '[i]t would defy reason to suppose that [the officers] had to secure a warrant before investigating, leaving putative burglars free to complete their crime unmolested.'" *Johnson*, 9 F.3d at 510 (quoting *United States v. Singer*, 687 F.2d 1135, 1144 (8th Cir. 1982) (alterations in original), *adopted in relevant part*, 710 F.2d 431 (8th Cir. 1983).

449 F.3d at 748.

Defendant stated in his motion to suppress that it was unclear from the police reports whether Officer Dong knew the suspected intruder had already left the property before he entered the house. Defendant conceded that if Officer Dong believed that the burglary was still in progress,

he would have been justified in entering the house so long as his belief was objectively reasonable. *Motion to Suppress (#51), pg. 5.* Officer Dong testified that he did not know the suspect had left Defendant's home prior to his initial entry. Officer Dong indicated that he went directly to Defendant's house. He did not speak to the neighbor who reported the possible break-in before entering the house.

Officer Dong estimated that he arrived at Defendant's house 10-20 minutes after the neighbor called the police. As discussed hereinafter, the accuracy of Officer Dong's time estimates are subject to some doubt. It appears, however, that Officer Dong arrived at the house within a sufficiently short time after the neighbor's call, such that it was reasonable to believe that the intruder or burglar was still in the house. Upon arrival, Officer Dong observed the broken Constable's sticker on the front door which was locked. He proceeded around the side of the house where he observed a broken window. He then found an open back door that led into the basement. These observations, combined with the neighbor's report, provided Officer Dong with probable cause to enter the house and conduct a search for an intruder or burglar.

Officer Dong and Officer Rossi conducted a search of the house to determine if anyone was inside the residence. During that search, Officer Dong entered the bedroom near the kitchen where he observed the suspicious items in plain view. Officer Dong contacted the Narcotics Bureau sergeant regarding what he had observed. He then exited the house to await the arrival of the narcotics detective(s). It does not appear that Officer Dong expanded the scope of the search after discovering the suspicious items. The scope and manner of Officer Dong's initial entry and search of the house was reasonable and was therefore lawful under the exigent circumstances exception to the Fourth Amendment's warrant requirement.

**2.   Whether the Second Warrantless Entry to Investigate the Possible Illegal Drug Laboratory Was Justified Under the Exigent Circumstances Exception to the Warrant Requirement.**

The second question is whether Detective Dockery's and Officer Dong's subsequent warrantless entry into the house was also justified under the exigent circumstances exception. There are circumstances where the discovery of a suspected narcotics laboratory clearly justifies a warrantless entry to protect the safety of the occupants, neighbors and the police officers. In *United*

*States v. Cervantes*, 219 F.3d 882 (9th Cir. 2000), the court upheld the officer's warrantless entry into an apartment to investigate a suspected methamphetamine lab.  The officer had been called to the scene by the firefighters who suspected the presence of a drug lab because of the strong chemical odor emanating from the apartments.  The court cited the following facts which justified the officer's warrantless entry:

> Officer Yergler was faced with a terrible, "sickening" chemical odor coming from Apartment 3, which he could smell as much as 20 feet away from the apartment.  Officer Yergler, as well as the firefighters who summoned him, believed that the fumes might be associated with methamphetamine production. Officer Yergler knew from his training that methamphetamine labs are volatile and therefore reasonably feared that Apartment 3 could explode at any moment. *See United States v. Whitten,* 706 F.2d 1000, 1014 (9th Cir. 1983) (recognizing that methamphetamine labs create a risk of explosion). Officer Yergler also reasonably believed that lives were in danger if an explosion occurred.  This fear was heightened by the fact that the odor was coming from an apartment building, possibly containing many people.  *Cf. United States v. Martin,* 781 F.2d 671, 674 (9th Cir. 1985) (holding that a potential explosion within an apartment increases the likelihood of finding exigent circumstances). Moreover, Officer Yergler testified that he witnessed several children around the apartment building.  One of the apartment building's tenants had left her apartment fearing harm to herself or to her infant child.  Given all of these circumstances, Officer Yergler reasonably believed that an emergency was at hand and that his assistance was immediately necessary for the protection of life.

*United States v. Cervantes*, 219 F.3d at 890-91.

The facts of this case are obviously not as extreme in regard to the risk of danger to life and limb, as those which confronted the police officer in *Cervantes.*  The Ninth Circuit has, however, also upheld warrantless entries to investigate a suspected drug lab under less extreme circumstances than those present in *Cervantes*.

In *United States v. Williams*, 630 F.2d 1322 (9th Cir. 1980), border patrol officers opened the trunk of an automobile which they suspected contained smuggled aliens.  Instead, they found several cardboard boxes containing beakers, plastic bags filled with white powder and wet paper towels that reeked of a strong chemical order.  Based on this discovery, the officers conducted an initial search of a nearby motor home which had been traveling with the automobile. The officers found some evidence that the motor home was being used as a drug lab.  Narcotics officers were then summoned to the scene and conducted a further search of the motor home which resulted in

14

the discovery of additional evidence that the motor home was being used as a PCP drug lab. In evaluating whether the warrantless search of the motor home was lawful, the court equated it to a house for purposes of the Fourth Amendment. The court held that the search of the motor home were justified under the exigent circumstances exception based on the officers' testimony that they entered the motor home because of the volatility of half manufactured PCP. The court held that "the trial court could find that manufacture of this particular controlled substance under these conditions created special dangers." *Williams*, 630 F.2d at 1327.

In *United States v. Echegoyen*, 799 F.2d 1271 (9th Cir. 1986), sheriff's deputies were summoned to a house located in a rural area by a neighbor who smelled a chemical odor emanating from the property. One of the officers recognized the odor of ether emanating from the house. The officers summoned the fire department to the scene. The firefighter who responded believed that flammable ether posed a serious fire hazard. The officers then entered the house, and arrested the occupants as they attempted to flee. After the suspects were in custody, the officers and firefighters re-entered the house and turned off the gas burners on the stove, opened the windows to ventilate the house and inspected the residence for other open flames. The officers and firefighters then exited the residence. The officers requested that narcotics officers come to the house to take over the investigation. "Two narcotics agents arrived and entered the residence. Based on what they saw and what was told to them by other detectives, the narcotics agents left the area to obtain a search warrant. The agents returned, executed the warrant, and seized the chemicals, equipment and cocaine. Prior to that time, nothing had been removed from the residence." 799 F.2d at 1274.

In upholding the officer's initial entry under the exigent circumstances exception, the court stated "that the existence of an explosive fire hazard and the possibility of illegal drug activity were exigent circumstances that justified the initial warrantless entry. The deputies' testimony as to the chemical smell, the activity in the cabin, the early morning hour, the remoteness of the Idyllwild area, and the limited availability of firefighting resources all justify the initial entry." *Echegoyen*, 799 F.2d at 1279. The court also held that the officers did not have the ability to obtain a telephone search warrant within sufficient time to avoid the undue risk of danger that would result from further delay before entering the house. *Id.* at 1279-80. Finally, the court held that the narcotics

1  officers' subsequent entry did not violate the warrant requirement based on the Supreme Court's

2  decision in *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942 (1978). The court stated:

> In *Tyler,* a fire broke out in a furniture store. The firefighter entered the building to put out the fire. Evidence of arson was found in the store, and a fire detective was called to the scene. He attempted to investigate the scene, but heavy smoke forced him to leave the premises. Four hours later the detective returned, entered the store to inspect the burned property, and removed physical evidence from the scene. The *Tyler* Court upheld the initial entry as justified by the exigency created by the fire. Significantly, the *Tyler* Court also held that the re-entry later in the day was "no more than an actual continuation of the first, and the lack of a warrant thus did not invalidate the resulting seizure of evidence." 436 U.S. at 511, 98 S.Ct. at 1951. In the instant case, the subsequent entry by the narcotics officers was based on the need to use their expertise in inspecting the premises for a possible fire hazard. Consequently, this second entry was merely a continuation of the initial lawful entry because both were done to alleviate the exigent circumstances. Accordingly, any evidence observed in plain view while making this entry should not be suppressed.

799 F.2d at 1280.

*See also Fisher v. City of San Jose*, 558 F.3d 1069, 1077 (9th Cir. 2009) (analyzing *Tyler* and *Echegoyen* in the context of an armed standoff).

The facts of this case are distinguishable from *Tyler* and *Echegoyen* in that Officer Dong's initial entry into the house was made to investigate a possible burglary and not a fire or suspected drug laboratory. That distinction, however, does not necessarily lead to a different conclusion regarding the legality of the second entry. Although Officer Dong did not find an intruder, he did observe items which caused him to suspect the presence of an illegal drug lab. The suspicious items included the dark liquid in the jars, the written equation, the powdery substance in the plastic bags, lye, drain cleaner, and the respirator. Officer Dong knew from his training and experience that some of the items were associated with illegal methamphetamine labs. He did not know, however, whether the suspect items were, in fact, being used to make methamphetamine. Officer Dong did not smell any chemical odors or see open flames or evidence of actually cooking in the residence. Officer Dong was aware, however, that some chemicals are combustible or present a danger of explosion even if no heat source is present. He was also aware that hazardous gases or fumes are associated with illegal drug production, although he did not smell any odor indicating the

presence of such gases.

Like the sheriff's deputies in *Echegoyen*, Officer Dong contacted the narcotics bureau to obtain assistance in evaluating what he had observed inside the house. According to Officer Dong, Detective Dockery arrived at the house approximately 30 minutes later. Based on Officer Dong's reported observations, Detective Dockery believed that some type of drug lab was located in the house and that it was possible that the liquid in the jars was methamphetamine. Although Officer Dong did not observe any open flames or ongoing cooking, Detective Dockery also testified that some volatile chemicals used in illegal drug manufacturing can explode absent an open flame or other heat source. Detective Dockery also testified that odorless phosphine gas, which is a by-product of methamphetamine production, might have been present in the house if the suspect lab was, in fact, a methamphetamine lab. There is no evidence, however, that Officer Dong was displaying any symptoms to indicate he had been exposed to phosphine or some other hazardous gas.

Detective Dockery testified that his purpose in entering the house was to determine whether the suspect lab posed a risk of danger to the officers or other persons in the vicinity. Clearly, Detective Dockery was not presented with the level of potential danger that faced the first responding officer in *Cervantes*, or even the sheriff's deputies who made the initial entry in *Echegoyen.* Detective Dockery's entry into the house was, however, comparable to the entries made by detectives in *Williams*, *Echegoyen* and *Tyler* who arrived after the immediate risk of danger had been substantially reduced by the first responders.

Officer Dong and Detective Dockery testified that they proceeded directly to the bedroom where the suspicious items were located and, upon Detective Dockery completing his inspection, exited the house by the same route. They did not enter other areas of the house. Although Officer Dong testified that they were inside the house for 10-15 minutes, Detective Dockery estimated that he was in the bedroom for approximately one minute, and inside the house for a total of one minute and fifteen seconds. Neither officer's time estimate is necessarily accurate or reliable. It probably took longer than one minute and fifteen seconds for Detective Dockery to enter the house, inspect and assess the suspect items and then exit the house. Detective Dockery stated in his search

warrant declaration that he observed "several bags of mimosa roots, bottles of lye, cans of Naptha fuel and several jars of brown liquid. . . . A recipe for the extraction process was on top of the jars of suspicious brown liquid." *Search Warrant Declaration, pg. 35*. On the other hand, it would not necessarily have taken Detective Dockery a substantial amount of time to make these observations. There is no indication that Detective Dockery did anything more than inspect the items in the bedroom that Officer Dong had reported as being suspicious for an illegal drug lab. Officer Dong's estimate that they were in the house 10-15 minutes may therefore be excessive.

       The Court concludes, based on the authority of *Tyler* and *Echegoyen*, that it was objectively reasonable for Detective Dockery to enter the house to inspect the suspicious items already observed by Officer Dong during his entry and to assess whether they posed an immediate risk of danger to the officers or other persons in the vicinity. The Court also finds that the scope and manner of Detective Dockery's entry and search was reasonable in response to the exigencies presented. He went only to the bedroom where Officer Dong had observed the suspect drug lab. After inspecting and assessing those items, Detective Dockery and Officer Dong left the residence. Although Detective Dockery also observed the presence of Naptha during his entry, there is no reason to doubt his testimony that the Naptha cans were in plain view as he proceeded to or from the bedroom.

       During his inspection, Detective Dockery observed the "mimosa hostilis" label on the plastic bags containing the reddish powder. This led him to discover the existence of Dimethyltryptamine (DMT), a Schedule I controlled substance, of which he had previously been unaware. He was also able to connect the other items found in the bedroom, including the written equation, to the production of Dimethyltryptamine (DMT). Without the information that Detective Dockery obtained during his entry, there would not have been sufficient information in the search warrant declaration to support a finding of probable cause. The declaration's statement that "Officer Dong observed jars of suspicious brown liquid, lye, and other items he believed to be associated with controlled substances," standing alone, was too general to support a finding of probable cause. Because Detective Dockery's entry into the house was also reasonable, his observations were lawfully included in the declaration and supported a finding of probable cause

for the issuance of the search warrant.

## CONCLUSION

The Court concludes that the Officer Dong's and Detective Dockery's warrantless entries into Defendant's house were objectively reasonable and justified under the exigent circumstances exception to the Fourth Amendment's warrant requirement. The evidence that was discovered as a result of those entries was therefore lawfully obtained and legitimately supported the issuance of the search warrant. Accordingly,

## RECOMMENDATION

**IT IS RECOMMENDED** that Defendant's Motion to Suppress Evidence for Fourth Amendment Violation (#51) be **denied**.

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 22nd day of July, 2013.

GEORGE FOLEY, JR.
United States Magistrate Judge